630 F.2d 398
 8 O.S.H. Cas.(BNA) 2205, 1980 O.S.H.D. (CCH) P 24,937
TEXAS INDEPENDENT GINNERS ASSOCIATION, Petitioner,
v.
F. Ray MARSHALL, Secretary of Labor, United States
Department of Labor, Eula Bingham, Assistant Secretary of
Labor, United States Department of Labor, and Occupational
Safety and Health Administration, United States Department
of Labor, Respondents.
TEXAS COTTON GINNERS ASSOCIATION, Petitioner,
v.
F. Ray MARSHALL, Secretary of Labor, United States
Department of Labor, Eula Bingham, Assistant Secretary of
Labor, United States Department of Labor, and Occupational
Safety and Health Administration, United States Department
of Labor, Respondents.
CHICANOS UNIDOS-CAMPESINOS, INC., Defensa, Inc., Motivation,
Education and Training, Inc., and Public Citizen
Health Research Group, Petitioners,
v.
OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION, United States
Department of Labor, F. Ray Marshall, Secretary of
Labor, and Eula Bingham, Assistant
Secretary of Labor, Respondents.
ARIZONA COTTON GINNERS ASSOCIATION, Petitioner,
v.
F. Ray MARSHALL, Secretary of Labor, United States
Department of Labor, Eula Bingham, Assistant Secretary of
Labor, United States Department of Labor, Occupational
Safety and Health Administration, United States Department
of Labor, Respondents.
CALIFORNIA COTTON GINNERS ASSOCIATION, Petitioner,
v.
F. Ray MARSHALL, Secretary of Labor, United States
Department of Labor, Eula Bingham, Assistant Secretary of
Labor, United States Department of Labor, Occupational
Safety and Health Administration, United States Department
of Labor, Respondents.
CALIFORNIA ASSOCIATION OF GROWER GINS, INCORPORATED, Petitioner,
v.
F. Ray MARSHALL, Secretary of Labor, United States
Department of Labor, Eula Bingham, Assistant Secretary of
Labor, United States Department of Labor, Occupational
Safety and Health Administration, United States Department
of Labor, Respondents.
 Nos. 78-2663, 78-2760, 78-2763, 78-2928, 78-3042 and 78-3044.
 United States Court of Appeals,
Fifth Circuit.
 Nov. 14, 1980.
 
 McCleskey, Harriger, Brazill & Graf, Don Graf, Lubbock, Tex., for petitioner.
 Carl W. Vogt, Fulbright & Jaworski, Washington, D.C., for California Cotton Ginners Ass'n., Oklahoma Cotton Ginner's Ass'n., New Mexico Cotton Ginner's Ass'n. and Southeastern Cotton Ginners Ass'n. and Southern Cotton Ginners Ass'n., intervenor and petitioners.
 Allen H. Feldman, Acting Counsel for Appellate Litigation, John A. Bryson, Atty., U.S. Dept. of Labor, Washington, D.C., for respondents in all cases.
 John Cary Sims, Diane B. Cohn, Washington, D.C., Robert B. Stulberg, Attys., New York City, for petitioner.
 Griswold, Bissig, LaSalle & Cobb, Lyman D. Griswold, Hanford, Cal., Carl W. Vogt, Washington, D.C., for petitioners.
 Petitions for Review of an Order of the Occupational Safety and Health Administration.
 Before WISDOM, HILL and VANCE, Circuit Judges.
 VANCE, Circuit Judge:
 
 
 1
 The Occupational Safety and Health Administration (OSHA) promulgated regulatory standards for the cotton gin industry under the Occupational Safety and Health Act (the Act). 29 U.S.C. § 651 et seq. Five industry associations petitioned for pre-enforcement review in this court,[1] with four other industry organizations intervening,[2] on the basis that the regulations are too stringent; four gin employee organizations petitioned for review[3] on the ground that the standards do not adequately protect workers against the hazards of cotton dust. The Supreme Court recently ruled that the Act requires OSHA to provide substantial evidence that a significant risk of harm arises from a workplace or employment. Industrial Union Department, AFL-CIO v. American Petroleum Institute, --- U.S. ----, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980) (plurality opinion). This circuit, affirmed on other grounds by the Supreme Court, had held that the Act also compels OSHA to adduce substantial evidence that the costs imposed by a regulation bear a reasonable relation to the benefits derived.[4] American Petroleum Institute v. OSHA, 581 F.2d 493, 503 (5th Cir. 1978). In protecting workers' safety and health Congress also limited OSHA's regulatory power through statutory requirements that we must enforce.
 
 I. BACKGROUND
 
 2
 Background information about the ginning industry and occupational diseases is essential for analysis of the justification, reasonable necessity, and feasibility of OSHA's regulations.
 
 A. The Ginning Industry
 
 3
 The ginning process consists of a series of mechanical operations that separate the lint from the seed so that the lint may be processed by textile mills and the seeds may be used by cottonseed oil mills. Additionally, ginning removes foreign matter that has become entangled in the raw cotton during harvesting. Most of the cotton crop is ginned in the fall and early winter, immediately after it is picked, on the farm or in the locality where it is grown.[5]
 
 
 4
 The ginning system is automated to a large extent with the cotton moving through pneumatic pipes. Cotton is delivered to the gin in storage trailers and removed by a pneumatic device. The cotton passes through machinery that separates the lint from the seed. The seed are conveyed to a storage house and the cotton lint is pneumatically conveyed through lint cleaners into the baling press where it is hydraulically pressed into bales.
 
 
 5
 Although the size of the operation and the capabilities of the individuals influence the composition of the workforce, the job functions in a typical cotton gin crew include a gin stand operator, lint cleaner operator, press man, sucker pipe operator and yard man. The average gin worker spends half of his time outside the gin shed away from cotton dust concentrations, and the typical gin is at least partially open-sided with substantial outside air circulation.[6]
 
 
 6
 Gin employment is characterized by its seasonal nature, migrant work force, and high employee turnover. Estimates of a typical ginning season vary from four-six weeks, four-eight weeks, and five-twelve weeks. The average employee works only about seven weeks per year, averaging sixty workhours per week.[7] Because a major source of gin workers is local transient labor, there is a rapid turnover among nonsupervisory employees. In the west, the labor force is supplemented by a large number of migrant workers, leading to a very high turnover rate. Additionally, gins often hire workers to meet their immediate needs; consequently, workers frequently move onto other jobs when a gin's operation is interrupted or finished. The general level of cotton dust exposure is significantly lower for gin workers than for textile workers and most other cotton manufacturing workers because of the seasonal nature of ginning, the transitory character of the labor force, and the gin workers' exposure to outside air.
 
 B. Respiratory Disease
 
 7
 Byssinosis, commonly called brown lung disease, is a respiratory impairment linked to inhalation of cotton dust.[8] Acute byssinosis, in its three stages, is characterized by occasional chest tightness on Monday or the first day of the work week (grade 1/2), chest tightness or breathlessness on every Monday (grade 1), and those symptoms on midweek days as well (grade 2). Chronic byssinosis, with symptoms similar to bronchitis and emphysema, involves chest tightness or breathlessness on Mondays and other work days and permanent incapacity from short-windedness or reduced breathing ability (grade 3).[9] Grades 1/2 through 2 are nondisabling and reversible while grade 3 is generally disabling and irreversible. The acute grades of byssinosis presently can be diagnosed only by subjective questions, while chronic byssinosis can also be detected by two pulmonary function tests.[10]
 
 
 8
 Numerous studies involving the textile industry have linked the occurrence of acute and chronic byssinosis to long term exposure to cotton dust, although they have not fully explained the etiology.[11] The least acute stage does not develop until after several years of a worker's exposure,[12] and the majority of textile and other cotton industry workers never evidence byssinosis. Six studies involving foreign ginning and one surveying the American ginning industry[13] have yielded conflicting results about whether byssinosis and chronic respiratory disease result from the exposure level in gins to cotton dust.[14]
 
 C. The Challenged Ginning Regulations
 
 9
 The Assistant Secretary of Labor for the Occupational Safety and Health Administration in 1978 promulgated regulations of cotton dust exposure by gin employees through informal rulemaking procedures. 29 C.F.R. § 1910.1046 (1979). These cotton gin regulations essentially involve five requirements. Beginning with the most controversial directive, (1) employers must provide medical surveillance of exposed employees.[15] Before ginning employment begins each year, medical technicians must take a medical history, administer a seven page questionnaire about subjective symptoms, give the pulmonary function tests for objective symptoms, and grade any byssinosis symptoms. After at least fourteen days of ginning employment, they must repeat the pulmonary function tests when the employee has been off work for at least twenty-four hours and then after he has worked for at least four hours in the gin that same day. The midseason test results must be compared with each other and with the pre-employment results, and all pulmonary measurements must be compared with the employee's results from prior years and with standard values for the general population. A physician must then prepare a report detailing the results of the examinations, his diagnosis of any byssinosis symptoms, and recommendations for health measures. The medical surveillance requirement does not apply for employees who have already been tested at another gin during that same season. (2) Gin operators must establish and implement a work practice plan to minimize employee exposure to cotton dust by assuring that all surfaces are kept as free as practicable from dust accumulation, providing for regular inspection and maintenance of all equipment and ventilation systems, requiring mechanical handling of cotton and waste products unless infeasible, and prohibiting maintenance or cleaning with compressed air equipment unless alternative methods are not feasible.[16] (3) Employers must provide disposable respirator masks for all employees desiring them and powered air purifying respirators to any employees suffering from respiratory impairment or performing specified tasks, and must assure the use of respirators by employees identified in medical surveillance as susceptible to cotton dust and by employees performing maintenance activities or using compressed air cleaning equipment.[17] (4) Gin operators must post warning signs about the respiratory dangers associated with cotton dust.[18] (5) They must provide training programs before ginning begins concerning those dangers and the protective measures discussed above.[19]
 
 
 10
 OSHA did not impose on the ginning industry a requirement for a maximum limit on airborne concentration of cotton dust (a permissible exposure limit, or PEL) or for dust emission controls on gin machinery. The basic reasons for not requiring a PEL and emission devices were that gin employees are only exposed to cotton dust for a short season, that the proper maximum level is not known for such seasonal exposure, and that the emission controls are infeasible because they would increase the construction cost of the average gin by sixty-five percent and would increase the farmer's ginning costs by fifty percent.[20]
 
 D. The Petition for Review
 
 11
 Five ginning industry organizations filed petitions for pre-enforcement review in this circuit of the cotton gin regulations, note 1 supra, and four other ginning associations intervened, note 2 supra. See 29 U.S.C. § 655(f). In this consolidated petition, they contend that the OSHA ginning regulations are not required by a material impairment of workers' health, are not feasible in their medical examination requirements, and are not reasonably necessary in their remaining requirements. This court granted their motion for a stay of the regulations pending appeal. Four gin employee organizations submitted petitions for review, note 3 supra, on the ground that the standards are not as high as necessitated by a material impairment of workers' health, because they do not include a maximum exposure limit to cotton dust. Several cotton industry organizations and cotton workers' unions also petitioned for review of the OSHA general regulations for the textile, cotton warehouse, and cottonseed industries, and the District of Columbia Circuit sustained those regulations except their application to the cotton seed oil industry.[21]
 
 II. STANDARD OF REVIEW
 A. The Substantial Evidence Standard
 
 12
 The Act unqualifiedly provides that "(t)he determinations of the Secretary shall be conclusive if supported by substantial evidence in the record considered as a whole." 29 U.S.C. § 655(f). This review standard applies to both factual determinations and policy determinations by OSHA, although its application to the latter is more difficult. AFL-CIO v. Marshall, 617 F.2d 636, 648 n.43 (D.C.Cir. 1979); Associated Industries of New York State, Inc. v. United States Department of Labor, 487 F.2d 342, 348 (2nd Cir. 1973); see American Petroleum Institute v. OSHA, 581 F.2d 493, 497 (5th Cir. 1978), aff'd on other grounds sub nom. Industrial Union Department, AFL-CIO v. American Petroleum Institute, 446 U.S. ----, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980).[22] For factual determinations, "the substantial evidence standard provided in the statute clearly is applicable." 581 F.2d at 497. Accord, Florida Peach Growers Association v. United States Department of Labor, 489 F.2d 120, 127 (5th Cir. 1974). "When available evidence of equivalent quality is conflicting, a finding in accordance with one view or the other should be considered to be supported by substantial evidence." American Petroleum Institute v. OSHA, 581 F.2d at 507.
 
 
 13
 For policy determinations, the administrative decision "must be scrutinized" even though it is "not so susceptible to verification or refutation by the record" as are factual findings. Id. at 497. Accord, Industrial Union Department, AFL-CIO v. Hodgson, 499 F.2d 467, 475 (D.C.Cir. 1974) ("exacting scrutiny"). This scrutiny of informal rulemaking involves a two-fold examination:
 
 
 14
 (The courts) have required the Secretary's action to be (1) consistent with the statutory language and purpose. Synthetic Organic Chemical Manufacturers Association v. Brennan, ... 503 F.2d (1155,) 1159 (3rd Cir. 1977). As this court stated in assessing an emergency temporary standard in Florida Peach Growers, "it seems clear that even with the required substantial evidence test, our review basically must determine whether the Secretary carried out his essentially legislative task in a manner (2) reasonable under the state of the record before him." 489 F.2d at 129. This includes, of course, a review of whether the Secretary exercised his decisionmaking power within the limits imposed by Congress.
 
 
 15
 American Petroleum Institute v. OSHA, 581 F.2d at 497. Accord, Taylor Diving & Salvage Co. v. United States Department of Labor, 599 F.2d 622, 624 (5th Cir. 1979); see Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415-16, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).[23]
 
 
 16
 The reasonableness requirement, as applied to OSHA policy determinations, stems from the mandate of the Administrative Procedure Act, 5 U.S.C. § 551 et seq., for a reviewing court to hold unlawful and to set aside agency action, findings, and conclusions, whether adopted through formal or informal rulemaking, that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Id. § 706(2)(A). This involves appellate scrutiny to determine (a) whether enough facts are available and have been investigated to render rational the making of a policy judgment;[24] (b) whether the factual premises underlying that policy judgment are "supported by substantial evidence," although there may be other conflicting evidence, in the record considered as a whole;[25] and (c) whether the policy judgment is reasonably related to those substantially supported factual premises so that " 'the Secretary carried out his essentially legislative task in a manner reasonable under the state of the record.' " American Petroleum Institute v. OSHA, 581 F.2d at 497 (quoting Florida Peach Growers Association, Inc. v. United States Department of Labor, 489 F.2d at 129). The agency record should contain the data required under the substantial evidence standard for appellate review of the reasonableness of OSHA's policymaking as well as of OSHA's obedience to other statutory limitations.[26]
 
 B. The Statutory Mandate and Limitations
 
 17
 The consistency requirement, which is that OSHA's action must accord with the Act's language and purpose, refers inter alia to several explicit statutory limitations on OSHA rulemaking. The Act authorizes only those OSHA regulations that are elicited by a significant risk of unsafe or unhealthful employment or workplaces, and that are reasonably necessary or appropriate to reduce that risk. For toxic materials or harmful physical agents, 29 U.S.C. § 655(b)(5) authorizes only those regulations that also are justified by a significant risk of material impairment of the health or functional capacity of employees and are feasible from both technological and economic standpoints. The substantial evidence standard applies to appellate review of OSHA's determination regarding each of these limitations.[27] This requires substantive review of the evidence in the agency record and not merely procedural review of the agency's genuine consideration of diverse informed opinions.
 
 C. Summary
 
 18
 The petitioning and intervening ginners in this case question whether the cotton gin regulations are necessitated by a significant risk of material health impairment, whether the ginning regulations are reasonably necessary or appropriate, and whether the medical surveillance requirement is feasible. The petitioning gin employee organizations assert that a permitted exposure limit (PEL) for cotton gin dust would most adequately protect workers and is reasonably necessary or appropriate.
 
 
 19
 The purpose of the Occupational Safety and Health Act to protect workers is most laudable. The only question that we decide is whether OSHA's regulations for cotton gins comply with the statutory requirements that Congress has prescribed. We conclude that they do not because OSHA has not found as a "threshold matter" that cotton dust poses a "significant health risk" in cotton gins, Part III infra, and that a standard is "reasonably necessary or appropriate to provide safe or healthful employment and places of employment." See Industrial Union Department, AFL-CIO v. American Petroleum Institute, --- U.S. ----, 100 S.Ct. 2844, at 2850 (1980) (plurality opinion); Part IV infra.
 
 
 20
 III. SIGNIFICANT RISK OF MATERIAL HEALTH IMPAIRMENT
 
 
 21
 Section 3(8) of the Act requires that all OSHA standards must be "reasonably necessary or appropriate to provide safe or healthful employment and places of employment." 29 U.S.C. § 652(8). In Industrial Union Department, AFL-CIO v. American Petroleum Institute, --- U.S. ----, 100 S.Ct. 2844 (1980) (plurality opinion), the Supreme Court construed this provision to require the Secretary of Labor to make a threshold finding "that the workplaces in question are not safe." ---- U.S. at ----, 100 S.Ct. at 2864. However, the Court explained:
 
 
 22
 But "safe" is not the equivalent of "risk free." There are many activities that we engage in every day-such as driving a car or even breathing city air-that entail some risk of accident or material health impairment; nevertheless, few people would consider these activities "unsafe." Similarly, a workplace can hardly be considered "unsafe" unless it threatens the workers with a significant risk of harm.
 
 
 23
 Id.
 
 
 24
 Section 6(b)(5) of the Act also provides that "standards dealing with toxic materials or harmful physical agents" shall assure "that no employee will suffer material impairment of health or functional capacity even if such employee has regular exposure ...." 29 U.S.C. § 655(b)(5). This "empowers the Secretary to promulgate standards, not for chemicals and physical agents generally, but for 'toxic chemicals' and 'harmful physical agents.' " Industrial Union Department, AFL-CIO v. American Petroleum Institute, --- U.S. at ----, 100 S.Ct. at 2864 (plurality opinion). The threshold finding of toxicity or harm under section 6(b)(5) is consistent with the threshold finding of significant risk of unsafety or unhealthfulness under section 3(8). Similarly, section 6(b)(5) requires that the toxic substances or harmful physical agent threaten a "material impairment of health or functional capacity."[28] Not just any impairment, but a material impairment, is required as the legislative history emphasizes.[29] Because section 3(8) applies to regulations of toxins and harmful agents as well as to all other OSHA regulations, Industrial Union Department, AFL-CIO v. American Petroleum Institute, --- U.S. at ----, 100 S.Ct. at 2864 (plurality opinion), the combined test applicable to toxins and harmful agents is that "the burden (is) on the Agency (OSHA) to show, on the basis of substantial evidence, that it is at least more likely than not that long-term exposure to (toxic material or harmful physical agents) presents a significant risk of material health impairment." Id. at ----, 100 S.Ct. at 2869.[30]
 
 
 25
 OSHA's finding of a health hazard from cotton ginning is based on the correlation between the occurrence of byssinosis from exposure to cotton dust in other facets of the textile industry and by several studies involving the ginning industry.[31] The studies of ginning employees relied on by OSHA include several studies of ginning operations in foreign countries as well as a study of American gins by Palmer. Despite the fact that the Palmer study found no evidence of byssinosis or other chronic respiratory disease among American gin workers, OSHA inferred a correlation between the foreign studies and the one conducted by Palmer.[32] In view of the significantly different ginning conditions and season in America with reduced worker exposure to cotton dust as well as the lack of evidence of byssinosis by Palmer, these studies do not constitute substantial evidence for OSHA's finding of a significant risk of a material health impairment.
 
 A. The American Ginning Study
 
 26
 Palmer utilized X-ray readings, respiratory symptom questionnaire, and spirometric tests in examining the incidence of byssinosis and other chronic respiratory disease among gin workers and a control group in the Rio Grande Valley and New Mexico. Results from the interviewer administered questionnaire showed that chronic respiratory disease was more prevalent in the control group, thirty-nine percent, than in the gin workers, thirty percent. Furthermore, the amount of chronic respiratory disease diagnosed by spirometric test was identical for the gin workers and the control group. Spirometer results, however, showed that forty-four percent of gin workers, called reactors, suffer a decline in their forced expiratory volume in one second, FEV 1, after several hours on the job of which twenty-seven percent manifested a moderate decline and seventeen percent a severe decline. Nonetheless, only acute, not chronic respiratory effects were shown by the pulmonary function results. Moreover, smokers had the least number of reactors and the most moderate and severe reactors on the pulmonary function tests. The significance of pulmonary function results is their indication that gin workers do not suffer any long term impairment, despite the evidence that gin workers do experience a daily nonchronic decline in pulmonary function during the ginning season.
 
 
 27
 The Palmer study found no evidence of byssinosis or other chronic respiratory disease among American gin workers. Much of the spirometer data as well as all of the questionnaire data supports the industry petitioners' stance in denying symptoms of byssinosis or other chronic respiratory disease. Some of the spirometer data supports OSHA's position in showing that gin workers suffer a temporary decline in FEV 1 and FVC measures during exposure to cotton dust-but not that they experience a permanent decline in those measures relative to the general nonginning population. This study does not provide substantial evidence of a significant risk of material health impairment.
 
 B. The Foreign Ginning Studies
 
 28
 In concluding that exposure to cotton dust was a health hazard for gin workers, OSHA relied on several foreign studies of ginning employees in Egypt, Uganda, Greece and Sudan.[33] Studies of gin workers in Egypt and Sudan showed a correlation between gin workers and byssinosis. The two El Batawi studies[34] found that thirty-eight percent and thirty-three percent of Egyptian gin workers had various grades of byssinosis and that workers in dusty areas had lower pulmonary function than nonginners as well as a substantial drop in pulmonary function during the workday. The Khogali studies[35] discovered that about twenty percent of Sudanese gin workers have various grades of byssinosis. Although OSHA "views these foreign studies as support"[36] for the promulgation of standards, the agency recognizes the "uncertainty in relying too heavily upon"[37] these studies, explaining that the ginning season in Egypt and Sudan is substantially longer than in the United States, the worker population is more stable and the primitive foreign gins often increase worker exposure to cotton dust because many manual processes are present in the gin. The Gilson study[38] in Uganda and the Kondakis investigation[39] in Greece did not adduce the occurrence of byssinosis in gin workers, although a decline in FEV 1 was found.[40]
 
 
 29
 C. The Cotton Manufacturing Industry Studies
 
 
 30
 OSHA argues that numerous studies involving the cotton yarn manufacturing, weaving, fabric manufacturing, and related cotton industries[41] provide substantial evidence that byssinosis and other chronic respiratory disease is linked to cotton exposure. We agree. The agency arguably has adduced substantial evidence of acute respiratory effects on American gin workers from cotton dust exposure; it assumes from cotton industry studies that these acute effects develop into byssinosis and other chronic respiratory disease. OSHA has not provided substantial evidence that byssinosis and other chronic disease arise from the exposure level to cotton dust in the ginning industry with its significantly different conditions and its significantly different exposure level. As discussed in Part I(A) supra, ginning is a seasonal industry involving annual exposure for only about ten weeks, unlike the year-round industries in cotton manufacturing. Workers are highly transitory and migrant, engaging in ginning for about seven weeks annually, unlike cotton industry workers. Gins are generally open-sided with much air circulation; workers spend about half their time outdoors, unlike the strictly indoor processes in cotton manufacturing. These different conditions in the ginning industry yield significantly reduced exposure to cotton dust. OSHA has not adduced substantial evidence that this exposure level produces the same significant risk of byssinosis and other chronic respiratory disease. The Supreme Court decision in Industrial Union Department is on point. There, OSHA failed to provide substantial evidence that a 1-10 part per million exposure to benzene presents a "significant risk of harm"; instead OSHA relied on a series of assumptions that lowering the exposure limit would reduce the occurrence of leukemia. --- U.S. at ----, 100 S.Ct. at 2873 (plurality opinion).
 
 
 31
 In the present case, OSHA has not produced substantial evidence that a ten week or less annual exposure for half the workday to cotton dust entails a significant risk, accepting that a year-round exposure does significantly threaten a material health impairment. Instead of findings based on substantial evidence, OSHA has made findings based on assumptions without an adequate evidentiary basis. OSHA has relied on the assumptions, from byssinosis resulting from the high exposure level in textile mills and other cotton manufacturing processes, that byssinosis must result from the substantially lower exposure level in cotton gins. As in Industrial Union Department, "(t)hese assumptions are not a proper substitute for the findings of a significant risk of harm required by the Act." Id. at ----, 100 S.Ct. at 2874. We reverse OSHA's determination and remand for consistent proceedings.
 
 
 32
 IV. REASONABLY NECESSARY OR APPROPRIATE STANDARD
 
 A. The Statutory Requirement
 
 33
 Section 3(8) of the Act defines an occupational safety and health standard authorized by the Act as a standard whose requirements are "reasonably necessary or appropriate to provide safe or healthful employment and places of employment." 19 U.S.C. § 652(8). The reasonably necessary or appropriate clause does not merely require that OSHA standards must be rational, because Congress added the limitation that standards must be "necessary or appropriate" to the reasonableness limitation. Instead the reasonably necessary[42] requirement imposes a substantive limitation upon the regulatory authority of OSHA, as this circuit stated in American Petroleum Institute v. OSHA, 581 F.2d 493 (5th Cir. 1978), aff'd on other grounds sub nom. Industrial Union Department, AFL-CIO v. American Petroleum Institute, --- U.S. ----, 100 S.Ct. 2844 (1980):The Act imposes on OSHA the obligation to enact only standards that are reasonably necessary or appropriate to provide safe or healthful workplaces. If a standard does not fit in this definition, it is not one that OSHA is authorized to enact.
 
 
 34
 581 F.2d at 502. The Supreme Court implicitly recognized this substantive restriction when it held that the reasonably necessary clause requires a significant risk of material harm before OSHA can promulgate regulations under Section 6(b)(5), 29 U.S.C. § 655(B)(5). Industrial Union Department, AFL-CIO v. American Petroleum Institute, --- U.S. ----, 100 S.Ct. 2844 (1980) (plurality opinion). Because of this and other statutory limitations, the Act "does not give OSHA the unbridled discretion to adopt standards designed to create absolutely risk-free workplaces regardless of cost." American Petroleum Institute v. OSHA, 581 F.2d at 502. Accord, Industrial Union Department, AFL-CIO v. American Petroleum Institute, --- U.S. at ----, 100 S.Ct. at 2864; Taylor Diving & Salvage Co. v. United States Department of Labor, 599 F.2d 622, 625 (5th Cir. 1979). The reasonably necessary or appropriate limitation requires that OSHA regulations must be reasonably essential or at least reasonably efficacious in reducing a significant risk of material harm.
 
 
 35
 This circuit in American Petroleum Institute held that the reasonably necessary limitation requires OSHA, before promulgating regulations, (1) to estimate the expected costs of its regulation, (2) to estimate the expected benefits of that regulation, and (3) to determine whether those benefits are reasonably related to those costs.
 
 
 36
 Before it regulates, the agency must show that a hazard exists and that its regulation will reduce the risk from the hazard, for "no (occupational safety and health) standard would be expected to impose added costs or inconvenience ... unless there is reasonable assurance that the frequency or severity of injuries or illnesses will be reduced." (Aqua Slide 'N' Dive Corp. v. CPSC,) 569 F.2d at 839. More importantly for today's case, Aqua Slide also requires the agency to assess the expected benefits in light of the burdens to be imposed by the standard. Although the agency does not have to conduct an elaborate cost-benefit analysis, 569 F.2d at 840, it does have to determine whether the benefits expected from the standard bear a reasonable relationship to the costs imposed by the standard. 569 F.2d at 842.
 
 
 37
 The only way to tell whether the relationship between the benefits and costs of the benzene standard is reasonable is to estimate the extent of the expected benefits and costs. See 569 F.2d at 843.
 
 
 38
 581 F.2d 493, 502-03. Accord, Florida Peach Growers Association, Inc. v. United States Department of Labor, 489 F.2d 120, 130 (5th Cir. 1974).[43] Although the Supreme Court plurality in Industrial Union Department did not reach the issue, Justice Powell in his concurring opinion also recognized that the reasonably necessary limitation, as well as the feasibility limitation, requires OSHA to estimate and compare the costs and benefits of a proposed regulation:
 
 
 39
 I conclude that the statute also requires the agency to determine that the economic effects of its standard bear a reasonable relationship to the expected benefits. An occupational health standard is neither "reasonably necessary" nor "feasible," as required by statute, if it calls for expenditures wholly disproportionate to the expected health and safety benefits.
 
 
 40
 OSHA contends that § 6(b)(5) not only permits but actually requires it to promulgate standards that reduce health risks without regard to economic effects, unless those effects would cause widespread dislocation throughout an entire industry .... In my view that claim is untenable.
 
 
 41
 .... It is simply unreasonable to believe that Congress intended OSHA to pursue the desirable goal of risk-free workplaces to the extent that the economic viability of particular industries-or significant segments thereof-is threatened.
 
 
 42
 Industrial Union Department, AFL-CIO v. American Petroleum Institute, --- U.S. at ----, 100 S.Ct. at 2877-78 (concurring opinion). Justice Powell explained that this comparison is required because the "cost of complying with a standard may be 'bearable' and still not reasonably related to the benefits expected." Id. at ----, n.4, 100 S.Ct. at 2850 n.4. This mandate for estimation of costs and benefits and of a reasonable relationship between those costs and benefits is not a requirement for formal cost-benefit analysis. American Petroleum Institute v. OSHA, 581 F.2d at 503; see Aqua Slide 'N' Dive Corp. v. CPSC, 569 F.2d 831, 840 (5th Cir. 1978).[44]
 
 
 43
 The substantial evidence standard of review applies to OSHA's comparison of costs and benefits. As this court ruled in American Petroleum Institute,
 
 
 44
 Until OSHA can provide substantial evidence that the benefits to be achieved ... bear reasonable relationship to the costs imposed ... it cannot show that the standard is reasonably necessary to provide safe or healthful workplaces.
 
 
 45
 581 F.2d at 504. OSHA's estimate of the anticipated cost and expected benefit of proposed regulations are factual findings that must be supported by substantial evidence in the record. Id. at 503; see, e. g., Aqua Slide 'N' Dive Corp. v. CPSC, 569 F.2d at 844. The agency's determination that the cost bears a reasonable relationship to the benefit, although a policy determination to a large degree, also is subject to the substantial evidence standard. E. g., Florida Peach Growers Association, Inc. v. United States Department of Labor, 489 F.2d at 129; see Aqua Slide 'N' Dive Corp. v. CPSC, 569 F.2d at 841; id. at 845 (Wisdom, J., concurring). For such a policy determination to be supported by substantial evidence, sufficient facts must be available to render a policy judgment rational; the factual premises underlying that judgment must be supported by substantial evidence; and the judgment must be rationally related to those factual premises so that the regulatory manner is reasonable. Part II(A) supra. As with other determinations, OSHA must make specific findings of these elements of reasonable necessity, see Industrial Union Department, AFL-CIO v. American Petroleum Institute, --- U.S. at ---- n.45, 100 S.Ct. at 2863 n.45 and must include its evidence in the record.
 
 B. OSHA's Noncompliance
 
 46
 OSHA conclusorily asserted that "significant worker protection will result" from the cotton ginning regulations and that "it is not possible to estimate anticipated declines in the incidence of byssinosis".[45] An assumption without supporting evidence or even a finding upon substantial evidence that regulatory benefits are "likely to be appreciable" is simply not sufficient to meet the reasonably necessary requirement of the Act. Industrial Union Department, AFL-CIO v. American Petroleum Institute, --- U.S. at ----, 100 S.Ct. at 2870; see id., at ----, 100 S.Ct. at 2878 (Powell, J., concurring); American Petroleum Institute v. OSHA, 581 F.2d at 503; see Aqua Slide 'N' Dive Corp. v. CPSC, 569 F.2d at 845 (Wisdom, J., concurring).[46] As in American Petroleum Institute, OSHA's refusal here to estimate the expected benefits of its ginning regulations and to show their reasonable relationship to the concomitant costs on the basis of substantial evidence requires the conclusion that the agency has not shown these regulations to be reasonably necessary on the basis of substantial evidence.[47]
 
 
 47
 OSHA's response that it is impossible to estimate any benefits from its regulations is as inadequate here as it was in American Petroleum Institute:
 
 
 48
 We are not persuaded by OSHA's argument that this standard should be upheld since the lack of knowledge concerning the effects of exposure to benzene at low levels makes an estimate of benefits expected from reducing the permissible exposure level impossible. The statute requires all conditions imposed by a standard to be reasonably necessary to provide safe or healthful employment, and it requires decisions to be based on "the best available evidence," "research, demonstrations, experiments, and such other information as may be appropriate," "the latest scientific data in the field," and "experience gained under this and other health and safety laws." By requiring the consideration of such kinds of information, Congress provided that OSHA regulate on the basis of knowledge rather than on the unknown .... Until OSHA can provide substantial evidence that the benefits to be achieved by reducing the permissible exposure limit from 10 ppm to 1 ppm bear a reasonable relationship to the costs imposed by the reduction, it cannot show that the standard is reasonably necessary to provide safe or healthful workplaces.
 
 
 49
 581 F.2d at 504 (footnote omitted). OSHA was able to estimate the anticipated costs of the cotton ginning regulations, thus, it should be capable of estimating the expected benefits upon substantial evidence. Because of the reasonably necessary limitation, OSHA is not authorized to promulgate regulations until it has substantial evidence[48] that they will ameliorate a significant risk to workers' health or safety and that they are reasonably necessary and appropriate by virtue of the regulatory benefits being reasonably related to the consequent costs.
 
 
 50
 Although OSHA has neither provided substantial evidence that there is a significant health risk to gin workers from cotton dust nor shown by substantial evidence that the standards promulgated for the cotton ginning industry are reasonably necessary, for the guidance of OSHA we note that there is also a feasibility requirement that must be proven if the other tests are met. Section 6(b)(5) of the Act provides that OSHA standards shall prevent "to the extent feasible," material health impairments from toxic materials or harmful physical agents. 29 U.S.C. § 655(b)(5). Whereas the reasonably necessary limitation ensures that an OSHA regulation will effectively ameliorate a significant health or safety risk without unreasonable cost, the feasibility limitation requires that the regulation must be attainable and that its achievement must be at a practical cost. The feasibility limitation includes both technological[49] and economic feasibility.[50] AFL-CIO v. Marshall, 617 F.2d 636, 655 (D.C. Cir. 1979); American Iron & Steel Institute v. OSHA, 577 F.2d 832 (3d Cir. 1978), cert. dismissed, --- U.S. ----, 100 S.Ct. 2844 (1980). OSHA has the burden of proving the feasibility of its section 6(b)(5) regulations in pre-enforcement review, RMI Co. v. Secretary of Labor, 594 F.2d 566, 573 (6th Cir. 1979) just as it carries the burden of proving feasibility in citation cases. Champlin Petroleum Co. v. OSHRC, 593 F.2d 637, 640 (5th Cir. 1979).
 
 CONCLUSION
 
 51
 OSHA has not adduced substantial evidence that its cotton ginning regulations are "reasonably necessary and appropriate to remedy a significant risk of material health impairment." Industrial Union Department, AFL-CIO v. American Petroleum Institute, --- U.S. at ----, 100 S.Ct. at 2863 (1980) (plurality opinion).[51] Because the Occupational Safety Health Act requires OSHA to meet these requirements, we vacate the regulations on these grounds and remand the case to OSHA for further consideration of any significant risk of material health impairment that may be remedied by a reasonably necessary and appropriate standard.
 
 
 52
 VACATED and REMANDED.
 
 
 
 [1]
 These petitioners are Texas Independent Ginners Association, No. 78-2663; Texas Cotton Ginners Association, No. 78-2760; Arizona Cotton Ginners Association, No. 78-2928; California Cotton Ginners Association, No. 78-3042; and California Association of Grower Gins, No. 78-3044
 
 
 [2]
 The intervenors are New Mexico Ginners Association, Oklahoma Cotton Ginners Association, Southeastern Cotton Ginners Association, and Southern Cotton Ginners Association
 
 
 [3]
 These petitioners are Chicanos Unidos-Campesinos, Inc.; Defensa, Inc.; Motivation, Education & Training, Inc.; and Public Citizen Health Research Group, No. 78-2763
 
 
 [4]
 See Part IV infra. Although the Supreme Court plurality in Industrial Union Department did not reach this issue, Justice Powell in his concurring opinion recognized the reasonably necessary limitation as well as the feasibility requirement
 
 
 [5]
 43 Fed.Reg. 27419 (1978)
 
 
 [6]
 Research Triangle Institute, 1 Cotton Dust IV-13 (Project No. 44V-1204-1 1976); Palmer, Finnegan, Herwitt, Wexweiler & Jones, The Prevalence of Byssinosis in Cotton Gins in the Lower Rio Grande Valley of Texas, and the Messila Valley of New Mexico 20 (Dec. 16, 1974, as edited subsequently) (unpublished study commissioned by NIOSH) (hereinafter cited as Palmer)
 
 
 [7]
 43 Fed.Reg. at 27419 (78 percent of the work hours of an average crew occur within an 8 week period); see also Palmer, supra note 6 at 7
 
 
 [8]
 Harris, Merchant, Kilburn & Hamilton, Byssinosis and Respiratory Diseases of Cotton Mill Workers, 14 J. Occupational Med. 199, 201-02 (1972); 43 Fed.Reg. 27350, 27352 (1978) (OSHA regulations for cotton industry)
 
 
 [9]
 Roach & Schilling, A Clinical and Environmental Study of Byssinosis in the Lancashire Cotton Industry, 17 Brit.J.Indus.Med. 1, 2 (1960); 41 Fed.Reg. 56500-01 (1976)
 OSHA acknowledges that, "(w)hile there is evidence of chronic respiratory effects in foreign gin worker populations, such evidence is yet to be gathered in this country." 43 Fed.Reg. at 27422.
 
 
 [10]
 One test measures the maximum volume of air that a worker can exhale (the forced vital capacity, or FVC), and the other determines the amount in one second that he can exhale (the forced expiratory volume in one second, or FEV 1). A worker's test results are then compared with normal values, and his FEV 1 before his shift is compared with his FEV 1 after several hours of work, to measure any reduction in his respiratory ability
 
 
 [11]
 43 Fed.Reg. at 27420; Harris, Merchant, Kilburn, & Hamilton, supra note 8, at 201
 
 
 [12]
 El Batawi, Byssinosis in the Cotton Industry of Egypt, 19 Brit.J.Indus.Med. 126, 130 (1962) (not until 3 years of ginning in long Egyptian season); see 43 Fed.Reg. at 27422
 
 
 [13]
 The foreign studies are El Batawi, supra note 12 (Egypt); El Batawi, Schilling, Valic & Walford, Byssinosis in the Egyptian Cotton Industry: Changes in Ventilatory Capacity During the Day, 21 Brit.J.Indus.Med. 13 (1964); Gilson, Stott, Hopwood, Roach, McKerrow & Schilling, Byssinosis: The Acute Effect on Ventilatory Capacity of Dusts in Cotton Ginneries, Cotton, Sisal, and Jute Mills, 18 Brit.J.Indus.Med. 9 (1962); Khogali, A Population Study in Cotton Ginnery Workers in the Sudan, 33 Brit.J.Indus.Med. 308 (1976) (hereinafter cited as Khogali I); Khogali, Byssinosis: A Follow-Up Study of Cotton Ginnery Workers in the Sudan, 33 Brit.J.Indus.Med. 166 (1976) (hereinafter cited as Khogali II); Kondakis & Pournaras, Byssinosis in Cotton Ginneries in Greece, 22 Brit.J.Indus.Med. 291 (1965). The American study is Palmer, supra note 6
 
 
 [14]
 If chronic disease occurs at all among gin workers, it is much less prevalent than for cotton textile workers. See Khogali II, supra note 13, at 172; 43 Fed.Reg. at 27422
 
 
 [15]
 29 C.F.R. § 1910.1046(e)
 
 
 [16]
 Id. § 1910.1046(c)
 
 
 [17]
 Id. § 1910.1046(d)
 
 
 [18]
 Id. § 1910.1046(g)
 
 
 [19]
 Id. § 1910.1046(f)
 
 
 [20]
 See 43 Fed.Reg. at 27424-25. OSHA promulgated different regulations for the cotton manufacturing industry generally at the time of the regulations for cotton gins in 1978. 29 C.F.R. § 1910.1043 (1979); 43 Fed.Reg. 27350 (1978). The original proposal included a PEL for cotton ginning, 41 Fed.Reg. 56109, 56515-16 (1976), but after hearings OSHA decided not to apply a PEL to gins. 43 Fed.Reg. at 27422-24, 27424-25. Before the present regulations, OSHA had imposed a dust exposure limit for the cotton industry in 1968 under the Walsh-Healy Act, 41 U.S.C. § 35 et seq. and then in 1971 under the Act as a national consensus standard and an established federal standard. See 29 U.S.C. § 652(9) and (10)
 The gin employee organizations assert that the former PEL applied to ginning, with the result that the challenged regulations improperly revoked the PEL. The 1971 standard applied to dust exposure in the workplace but not in agricultural employment. See Fed.Reg. 10466, 10468 (1971). Accordingly, we believe it is clear that the 1971 PEL never applied to the ginning industry, in light of the explicit subsequent exemption for agricultural pursuits and the total lack of enforcement efforts for ginning. See 29 C.F.R. § 1928(b) (1979) (present version).
 
 
 [21]
 AFL-CIO v. Marshall, 617 F.2d 636 (D.C.Cir. 1979)
 
 
 [22]
 We recognize that several courts have expressed concern over whether the substantial evidence test practicably can be applied to legislative-type regulations arising from informal rulemaking. Associated Indus. Union Dep't of N.Y. State, Inc. v. United States Dep't of Labor, 487 F.2d at 354. The Act requires application of the substantial evidence test, however, and we believe that this is practicable
 We reject the suggestion that only OSHA factual determinations, not its policy decisions, in regulations are subject to the substantial evidence test. For such a rule, see American Iron & Steel Inst. v. OSHA, 577 F.2d 825, 831 (3rd Cir. 1978), cert. dismissed, --- U.S. ----, 101 S.Ct. 38, 65 L.Ed.2d ---- (1980); but see Synthetic Organic Chemical Mfgrs. Ass'n v. Brennan, 503 F.2d 1155, 1159-60 (3rd Cir. 1974), cert. denied, 420 U.S. 973, 95 S.Ct. 1396, 43 L.Ed.2d 653 (1975). See also Society of the Plastics Indus., Inc. v. OSHA, 509 F.2d 1301, 1304 (2nd Cir.), cert. denied, 421 U.S. 992, 95 S.Ct 1998, 44 L.Ed.2d 482 (1975). See generally 2 O.S.H.A. § 11.04(2)(b) (MB) (1977).
 
 
 [23]
 The Supreme Court did not reach this issue in Industrial Union Department, ---- U.S. at ---- n.62, 100 S.Ct. at 2871 n.62 (plurality opinion). The third aspect of the judicial examination, not at issue in this case, is "whether the Secretary's action followed the necessary procedural requirements." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 417, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971)
 
 
 [24]
 This element is the arbitrary and capricious test that is generally applicable to informal rulemaking. 1 K. Davis, Administrative Law Treatise § 6:6 (2d ed.1978); e.g., Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415-16, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). While this rationality assessment is necessary, "mere rationality is not equivalent to substantial evidence." American Petroleum Inst. v. OSHA, 581 F.2d at 503; accord, Aqua Slide 'N' Dive Corp. v. CPSC, 569 F.2d 831, 841 (5th Cir. 1978). The substantial evidence standard instead "provides for more rigorous scrutiny than the usual 'arbitrary and capricious' test." AFL-CIO v. Marshall, 617 F.2d at 649. Accord, Abbott Laboratories v. Gardner, 387 U.S. 136, 143, 87 S.Ct. 1507, 1512, 18 L.Ed.2d 681 (1967) ("considerably more generous judicial review")
 
 
 [25]
 The Act also requires that the factual premises must be founded "on the basis of the best available evidence," 29 U.S.C. § 655(b)(5)
 
 
 [26]
 What we are entitled to at all events is a careful identification by the Secretary ... of the reasons why he chooses to follow one course rather than another. Where that choice purports to be based on the existence of certain determinable facts, the Secretary must, in form as well as substance, find those facts from evidence in the record. By the same token, when the Secretary is obliged to make policy judgments where no factual certainties exist or where facts alone do not provide the answer, he should so state and go on to identify the considerations he found persuasive
 Industrial Union Dep't, AFL-CIO v. Hodgson, 499 F.2d at 475-76. Accord, Synthetic Organic Chemical Mfgrs. Ass'n v. Brennan, 503 F.2d at 1157; Associated Indus. of N.Y. State, Inc. v. United States Dep't of Labor, 487 F.2d at 353. 29 U.S.C. § 655(e) requires the Secretary of Labor to state the reasons for promulgating any standard.
 
 
 [27]
 It governs determinations of a significant risk of material health impairment, Industrial Union Dep't, AFL-CIO v. American Petroleum Inst., --- U.S. at ----, 100 S.Ct. at 2869 (plurality opinion), aff'g American Petroleum Inst. v. OSHA, 581 F.2d at 506; of reasonable necessity or appropriateness, id. at 503; see Aqua Slide 'N' Dive Corp. v. CPSC, 569 F.2d at 84; Florida Peach Growers Ass'n, Inc. v. United States Dept. of Labor, 489 F.2d at 129; of feasibility, Marshall v. West Point Pepperell, Inc., 588 F.2d at 984-85; Ace Sheeting & Repair Co. v. OSHRC, 555 F.2d 439, 441 (5th Cir. 1977); and of the best available evidence, see American Petroleum Inst. v. OSHA, 581 F.2d at 507. OSHA has the "burden of establishing the need for a proposed standard" by providing substantial evidence that each of these requirements is met. See Industrial Union Dep't AFL-CIO v. American Petroleum Inst., --- U.S. at ----, 100 S.Ct. at 2870
 
 
 [28]
 We hereinafter refer to this as a "material health impairment."
 
 
 [29]
 The original proposal authorized OSHA regulations to assure "that no employee will suffer any impairment of health or functional capacity." Legislative History of the Occupational Safety & Health Act of 1970, at 243 (Comm. Print 1971) (emphasis added). Congress then amended the draft to authorize regulations to prevent a material impairment. See Industrial Union Dep't, AFL-CIO v. American Petroleum Inst., --- U.S. at ---- & n.52, 100 S.Ct. at 2866-67 & n.52 (plurality opinion)
 
 
 [30]
 "OSHA is not required to support its finding that a significant risk exists with anything approaching scientific certainty." Id. at ----, 100 S.Ct. at 2871
 
 
 [31]
 See 43 Fed.Reg. 27420, 27421 (1978)
 
 
 [32]
 Id. OSHA, however, subsequently recognized that it has "no evidence of chronic respiratory disease among gin workers exposed to current levels of dust in U.S. gins." Id. at 2743
 
 
 [33]
 Id. at 2720
 
 
 [34]
 El Batawi, supra note 12 and 13. An epidemiological survey by El Batawi (1962) provided the first published evidence of the occurrence of byssinosis in the Egyptian cotton industry. El Batawi examined more than 600 workers and found that the prevalence of byssinosis was thirty-eight percent in the ginneries where the cotton seeds are removed, fifty-three percent in the bale pressing plants and twenty-seven percent in the card rooms of spinning mills. In a second study, El Batawi included ventilatory capacity tests to examine cotton gin workers who were exposed to cotton dust
 The cotton ginning process in Egypt is quite different from those found in the United States. In the ginnery, the cotton which has been picked in the fields, is opened and mixed by throwing it into the air. This process is called farfara, derived from an Arabic word meaning to flutter. Accordingly there are higher concentrations of cotton dust in the Egyptian gins.
 
 
 [35]
 Khogali, supra note 13. Khogali found a statistically significant relationship between the concentration of fine dust in comparing various farfara and gin workers and the prevalence of byssinosis. He also found a significant relationship between fine dust concentration and the mean fall in FEV 1 for gin and farfara workers
 
 
 [36]
 43 Fed.Reg. at 27421 (1978)
 
 
 [37]
 Id
 
 
 [38]
 Gilson, supra note 13, only studied a small number of workers in three gins in Uganda. Actual exposure to cotton dust was lower than in the Egyptian and Sudanese gins because the season was only four months and the workers spent a significant part of the workday outside the gins
 
 
 [39]
 Kondakis, supra note 13 studied the prevalence of byssinosis among a sample of 70 ginnery workers in Greece, but did not present the dust levels encountered in the study
 
 
 [40]
 43 Fed.Reg. 27420, 27421 (1978)
 
 
 [41]
 E. g., Harris, Merchant, Kilburn & Hamilton, supra note 17; Merchant, Kilburn, O'Fallon, Hamilton & Lumsden, Byssinosis and Chronic Bronchitis Among Cotton Textile Workers, 76 Annals Internal Med. 423 (1972); Merchant, Lumsden, Kilburn, O'Fallon, Ujda, Germino & Hamilton, Dose Response Studies In Cotton Textile Workers, 15 J. Occupational Med. 222 (1973)
 
 
 [42]
 For brevity, we refer to "reasonably necessary or appropriate" as the "reasonably necessary" requirement
 
 
 [43]
 In Florida Peach Growers, we said that "(t)he promulgation of any standard will depend upon a balance between the protection afforded by the requirement and the effect upon economic and market conditions in the industry." 489 F.2d at 130 (for emergency standard). See Aqua Slide 'N' Dive Corp. v. CPSC, 569 F.2d at 842, 844; id. at 845 (Wisdom, J., concurring)
 
 
 [44]
 A requirement for formal cost-benefit analysis demands that regulatory benefits exceed their costs. The reasonably necessary requirement in the Act only demands that the expected costs of OSHA regulations be reasonably related to the expected benefits, leaving considerable discretion for the agency as long as it is exercised on substantial evidence and with an adequate statement of reasons
 Other circuits have construed the feasibility limitation of the Act to require a similar comparison of costs and benefits. RMI Co. v. Secretary of Labor, 594 F.2d 566, 571-73 (6th Cir. 1979); Turner v. Secretary of Labor, 561 F.2d 82, 85-86 (7th Cir. 1977). But see AFL-CIO v. Marshall, 617 F.2d 636, 662 (D.C. Cir. 1979).
 
 
 [45]
 43 Fed.Reg. 27418, 27429 (1978). The full text of OSHA's only discussion of expected benefits from its ginning regulations and of their relationship to the estimated costs is as follows:
 BENEFITS
 OSHA policy and conclusions on benefit assessment are described in the preamble to the cotton dust regulation for other sectors. In the absence of current, directly relevant epidemiological studies, it is not possible to estimate anticipated declines in the incidence of byssinosis that would result from implementation of the provisions of the final regulation of cotton dust in gins. OSHA is confident that significant worker protection will result from mandated changes in work practices and from medical surveillance and respirator programs. Pending the result of further NIOSH study, more costly controls do not appear to be warranted. The estimated costs of the final regulation of cotton dust in gins are modest when compared to those estimated for the proposed regulation, and OSHA feels that the anticipated benefits in terms of improved worker health will fully justify such costs.
 Based upon the foregoing and the record as a whole, OSHA finds that compliance with the standard is well within the financial capability of the ginning industry. Moreover, although the benefits of the standard cannot rationally be quantified in dollars, OSHA has given careful consideration to the question of whether these costs are justified in light of the hazards of exposure to cotton dust. OSHA concludes that these costs are minimal and necessary in order to effectuate the statutory purpose of the Act and to adequately protect employees from the hazards of exposure to cotton dust.
 Id.
 
 
 [46]
 Justice Powell stated,
 In this case, OSHA did find that the "substantial costs" of the benzene regulations are justified. See supra, at 3. But the record before us contains neither adequate documentation of this conclusion, nor any evidence that OSHA weighed the relevant considerations. The agency simply announced its finding of cost-justification without explaining the method by which it determines that the benefits justify the costs and their economic effects. No rational system of regulation can permit its administrators to make policy judgments without explaining how their decisions effectuate the purposes of the governing law, and nothing in the statute authorizes such laxity in this case.
 Industrial Union Dep't, AFL-CIO v. American Petroleum Inst., --- U.S. at ----, 100 S.Ct. at 2878 (concurring opinion) (footnote omitted). Similarly, as Judge Wisdom said in Aqua Slide,
 But the Commission is required to do more than determine whether there are any benefits to its regulation. Congress required it to consider the economic costs .... The Commission's determination that benefits exist is not the only conclusion that must be supported by substantial evidence. Most importantly, the balance the Commission draws between the benefits and the costs must have such support.
 569 F.2d at 845 (concurring opinion).
 
 
 [47]
 OSHA argues that "substantial evidence supports the Secretary's determination that benefits will accrue to gin workers in the form of greater health protection and avoidance of respiratory disease," citing studies linking cotton dust exposure to respiratory disease and the Palmer study showing only that gin workers demonstrate some acute symptoms. That is not the question. OSHA has not offered substantial evidence that significant benefits will result or that the benefits are reasonably related to the substantial costs of the ginning regulations
 
 
 [48]
 This need only be the best available evidence. Section 6(b)(5) of the Act requires OSHA in promulgating regulations of toxic materials or harmful physical agents, to act "on the basis of the best available evidence," including "the latest available scientific data in the field" and "research, demonstrations, experiments, and such other information as may be appropriate." 29 U.S.C. § 655(b)(5). In holding that OSHA had not adduced substantial evidence of a significant risk of material health impairment, the Supreme Court in Industrial Union Department emphasized that OSHA had not considered evidence that was available and had not performed research and experiments that were practicable. This circuit in American Petroleum Institute v. OSHA, vacated and remanded an OSHA regulation on the basis that OSHA had ignored available evidence that was the best available data
 The industry petitioners have moved for remand for OSHA to consider a recent American study of California gin workers that apparently finds no excess prevalence of byssinosis or other chronic or acute pulmonary disease among cotton gin workers. OSHA has refused to consider that study and opposes the motion, for reasons that we do not comprehend. On further consideration OSHA's continued refusal to consider this latest available scientific test would violate its statutory obligation to consider the best available evidence.
 
 
 [49]
 This aspect of the feasibility limitation demands that OSHA requirements must be achievable with existing, nearly developed or available technology. A regulation clearly is feasible if "little, if any, technological innovation will be necessary for compliance to be reached in the entire industry." AFL-CIO v. Marshall, 617 F.2d at 658 (D.C. Cir. 1979)
 The record before us does not contain sufficient evidence to demonstrate the feasibility of the medical surveillance provision proposed by OSHA.
 
 
 [50]
 The economic feasibility aspect of the statutory feasibility limitation requires that OSHA regulations must be affordable and also must be of practical cost. Two circuits have explicitly recognized that the feasibility limitation requires comparison of a regulation's costs to its benefits. In Turner Co. v. Secretary of Labor, 561 F.2d 82 (7th Cir. 1977) the court stated
 (Regulatory standards) will not be required without regard to the costs which must be incurred and the benefits they will achieve. In determining whether controls are economically feasible, all the relevant cost and benefit factors must be weighed.
 Id. at 85. Accord, RMI Co. v. Secretary of Labor, 594 F.2d 566 (6th Cir. 1979).
 OSHA has also recognized that the feasibility limitation requires a comparison of costs and benefits. E. g., Atlantic Steel Co., (1977-1978) Occup'l Saf. & Health Dec. (CCH) P 22,843 (1978); Castle & Cooke Foods, (1977-1978) Occup'l Saf. & Health Dec. (CCH) P 21,854 at 26,325 (1977); Great Falls Tribune Co., (1977-1978) Occup'l Saf. & Health Dec. (CCH) P 21,844 at 26,303 (1977); Continental Can Co., (1976-1977) Occup'l Saf. & Health Dec. (CCH) P 21,109 (1976).
 
 
 [51]
 This finding, together with our conclusion in note 20 supra, demonstrates that the gin employee organizations' petition for review of the OSHA standards on the ground that they do not adequately protect workers is without merit